**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| Edhadji Mbaye, Modou Diop, Tahirou Diakite, and Talla Samb, on behalf of themselves and others similarly situated in the proposed FLSA Collective Action,<br><br>    *Plaintiffs,*<br><br>- against -<br><br>RCI Hospitality Holdings, Inc., Peregrine Enterprises Inc. (d/b/a Rick's Cabaret New York), RCI 33rd Ventures, Inc. (d/b/a Hoops Cabaret and Sports Bar), 48 West 33rd Street Corp. (d/b/a Hoops Cabaret and Sports Bar), RCI Dining Services (37th Street), Inc. (d/b/a Vivid Cabaret), Eric Langan, and Kes Senevi,<br><br>    *Defendants*. | Case No.: 1:23-cv-02967-VSB |

## DEFENDANTS' REPLY MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT
## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56

Dated: March 10, 2025

**AKERMAN LLP**

Jeffrey A. Kimmel
M. Adil Yaqoob
1251 Avenue of the Americas, 37th Floor
New York, New York 10020
Tel: (212) 259-6435
Fax: (212) 905-6408
Email: jeffrey.kimmel@akerman.com
   adil.yaqoob@akerman.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................................ i

Table of Authorities ............................................................................................................ iii

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT.......................................................................................................................... 2

    POINT I PLAINTIFFS' AFFIDAVITS ARE SHAM AFFIDAVITS THAT
    SHOULD BE DISREGARDED............................................................................... 2

        A.    Standard of Law ............................................................................................ 2

        B.    Plaintiff Diakite's Affidavit is a Sham Affidavit which Should Be
            Disregarded .................................................................................................. 2

        C.    Plaintiff Samb's Affidavit is a Sham Affidavit which Should Be
            Disregarded .................................................................................................. 4

        D.    Plaintiff Mbaye's Affidavit is a Sham Affidavit which Should Be
            Disregarded .................................................................................................. 5

        E.    Plaintiff Diop's Affidavit is a Sham Affidavit which Should Be
            Disregarded .................................................................................................. 5

    POINT II PLAINTIFFS' WERE NOT EMPLOYEES OF THE CLUBS UNDER
    ANY OF THE TESTS ............................................................................................. 6

        A.    Standard of Law ............................................................................................ 6

        B.    Plaintiffs Were Not Employees of Any of the Defendants Under
            the Economic Realities Test.......................................................................... 7

            a.    The Clubs Did Not Exercise Control Over Plaintiffs .................... 7

            b.    Plaintiffs Made Significant Investments In Their
                 Businesses and Faced Opportunities For Profit And Risks
                 of Loss............................................................................................. 9

            c.    Plaintiffs' Success Depended On Their Skill and Initiative ......... 10

            d.    Plaintiffs Had Full Control Over the Duration And
                 Permanence of Their Relationship with the Clubs ...................... 10

            e.    Restroom Attendants Are Not Integral to the Club's
                 Business ......................................................................................... 11

        C.    Plaintiffs Were Not Employees of Defendants Under the Formal
            Control Test ................................................................................................. 12

        D.    Plaintiffs Were Not Employees of Defendants Under the
            Functional Control Test .............................................................................. 13

POINT III RCI HOSPITALITY HOLDINGS INC. SHOULD BE DISMISSED
AS A DEFENDANT............................................................................................. 13

POINT IV THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED
FROM THE ACTION ......................................................................................... 14

POINT V PLAINTIFFS FAIL IN THEIR ATTACK OF DEFENDANTS'
WITNESSES TESTIMONY ............................................................................... 14

CONCLUSION............................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barfield v. N.Y. City Health & Hosps. Corp*.,
   537 F.3d 132 (2d Cir. 2008)......................................................................................................7

*Chao v. Mid-Atlantic Installation Servs., Inc*.,
   16 Fed. App'x. 104, 107 (4th Cir. 2001)…………………………………………………..10

*Fed. Deposit Ins. Corp. v. Murex LLC*,
   500 F. Supp. 3d 76 (S.D.N.Y. 2020).....................................................................................2, 15

*Franze v. Bimbo Bakeries USA, Inc*.,
   826 F. App'x 74 (2d Cir. 2020)...............................................................................................11

*Kaplan v. Home Depot USA, Inc*.,
   No. 11 CIV. 2125 PAE, 2012 WL 3283456 (S.D.N.Y. Aug. 13, 2012)..................................15

*Malone v. Town of Clarkstown*,
   No. 19 CV 5503 (VB), 2022 WL 2834105 (S.D.N.Y. July 20, 2022) ....................................14

*Ocampo v. 455 Hosp. LLC*,
   No. 14-CV-9614 (KMK), 2021 WL 4267388 (S.D.N.Y. Sept. 20, 2021) ..............................14

*Ocampo v. Brown & Appel, LLC*,
   No. 21-2579-CV, 2022 WL 17684587 (2d Cir. Dec. 15, 2022).............................................14

*Saleem v. Corp. Transportation Grp*.,
   Ltd., 854 F.3d 131, 139 (2d Cir. 2017)....................................................................6, 9, 10, 11

*Zheng v. Liberty Apparel Co*.,
   355 F.3d 61 (2d Cir.2003)......................................................................................................13

**Statutes**

FLSA.................................................................................................................................1, 7, 14

**Rules**

Fed. R. Civ. P. 56................................................................................................................13, 15

## PRELIMINARY STATEMENT

In their opposition papers, Plaintiffs do nothing to refute Defendants' arguments that they are entitled to summary judgment. Rather, Plaintiffs spill much ink asserting irrelevant lies about Defendants' business and refer to an over-decade old case that is plainly irrelevant to the facts in this case. It is not surprising that Plaintiffs spend so much time simply trying to insult Defendants given that the facts in this case do not support their claim that they were employees of Defendants. In fact, because of this dearth of evidence, Plaintiffs submit sham affidavits which clearly contradict their deposition testimony.

Notwithstanding Plaintiffs' attempt to muddy the clear record, Plaintiffs were not employees of the Clubs[1] -- a fact that is supported by the undisputed evidence in this case. The undisputed evidence shows, among other things, that the (1) Clubs did not hire or fire Plaintiffs during the relevant period; (2) Clubs did not determine Plaintiffs' individual work schedules; (3) Clubs did not review or evaluate Plaintiffs' work; (4) Clubs did not require Plaintiffs to purchase any "tools of trade"; (5) the Clubs did not instruct Plaintiffs regarding how to perform their job; and (6) Plaintiffs could and did permit others to perform restroom attendant services on their behest when they decided not to work on any given night, as Plaintiff Mbaye chose to do. Rather it was a third party named Mustafa Diop ("Mustafa") who brought on, scheduled, and instructed Plaintiffs as to their work as restroom attendants.

In sum, Plaintiffs were not employees of the Clubs and the Clubs exercised no material control over how they provided their services. As such, the Clubs cannot be held liable for any of Plaintiffs' FLSA or NYLL claims.  Accordingly, for the reasons fully set forth below, Defendants

---

[1] Each of the Clubs are separate entities with separate management that operate independent of each other, and nothing in this brief should be interpreted to suggest otherwise.

are entitled to summary judgment dismissing Plaintiffs' Complaint in its entirety, as a matter of law.

## ARGUMENT

## POINT I

## PLAINTIFFS' AFFIDAVITS ARE SHAM AFFIDAVITS THAT SHOULD BE DISREGARDED

### A.    Standard of Law

Realizing that Plaintiffs' deposition testimony and all other material evidence in this case only support the fact that they were not employees of the Clubs, Plaintiffs submit affidavits which materially and directly contradict Plaintiffs' deposition testimony. However, "[u]nder the sham affidavit doctrine, 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.'" *Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 94 (S.D.N.Y. 2020). The sham affidavit rule is typically implicated where a party tries to create an issue of fact, via affidavit, in order to defeat "an otherwise meritorious summary judgment motion." *Id.* at 95. Here, each of the Plaintiffs have submitted affidavits which contradict their deposition testimony for the express purpose of trying to defeat Defendants' motion for summary judgment. The Court should disregard these sham affidavits.

### B.    Plaintiff Diakite's Affidavit is a Sham Affidavit which Should Be Disregarded

In his affidavit, Plaintiff Diakite repeatedly contradicts his deposition testimony. The table below illustrates the specific examples of where his affidavit contradicts his deposition testimony.

| Deposition Testimony | Affidavit |
|---|---|
| Diakite Tr. 23: 12-14<br>12 Q. Did you ever receive any<br>13. performance evaluations for your work<br>14. A. No. | Affidavit ¶ 24<br><br>In some cases [during certain check-ins], the managers would conduct walkthroughs of the restroom, inspecting stalls, floors, and other areas to confirm that proper cleaning protocols were being followed. Additionally, the managers used these visits to provide feedback on my |

| | performance, address any questions I had, and reinforce company policies related to safety, hygiene, and customer service. |
|---|---|
| Diakite Tr. 12: 2-11<br>2 Q. How do you know him?<br>3 A. Mustafa he was -- he was the<br>4 person that I answered to any time I had<br>5 situations. He is the person that I -- he<br>6 basically was my supervisor.<br>7 Q. When was this?<br>8 A. During my time working at all<br>9 three clubs.<br>10 Q. All three clubs?<br>11 A. Yes. | Affidavit ¶ 26<br>Nearly every shift at Rick's, Ms. Morelli [a manager at Rick's Cabaret] supervised my job responsibilities, and provided instructions for addressing issues." |
| Diakite Tr. 13: 6-15<br>9 Q. What you did speak to [Mustafa]about?<br>10 A. He basically told me about the<br>11 position, what is required of me, what I<br>12 have to do. He gave me my schedule.<br>13 Anything that I had to do with any of the<br>14 three clubs I would go -- it would go<br>15 through Mustafa. | Affidavit ¶ 33<br><br>Ms. Morelli managed my work schedule at Ricks. Regardless of whether there were three (3) patrons, on a slow night, or hundreds of patrons, on a busy night, I was expected to stay for the full shift. Ms. Morelli was responsible for assigning my hours, and adjusting my fixed schedule, depending how busy Rick's was. Mr. Castro and Mr. Campbell were responsible for assigning my hours, and adjusting my fixed schedule, depending how busy Vivid and Hoops were |
| Diakite Tr. 27: 19-25, 28: 2<br><br>19 Q. Did he tell you to tell him if<br>20 you couldn't make any of your shifts at<br>21 the clubs?<br>22 A. During the trip or in general?<br>23 Q. In general.<br>24 A. Everything regarding the club,<br>25 everything that had to do with the club<br>2 went through Mustafa. | Affidavit ¶ 34<br><br>I was expected to notify my managers at Defendants' Gentleman's Clubs whenever I: (i) could not show up for a scheduled shift; (ii) would arrive late; or (iii) needed to leave early. |
| Diakite Tr. 14: 2-10<br><br>Q. But Mustafa had to approve you<br>3 working at Rick's before you could work at<br>4 Rick's; is that correct?<br>5 A. Correct.<br>6 Q. Did anybody else have to approve<br>7 your working at Rick's before you worked<br>8 at Rick's?<br>9 A. That is a question you have to<br>10 ask Mustafa, but I am not sure.<br><br>Diakite Tr. 19: 9-19<br>9 Q. So Rick's was the club you<br>10 regularly worked at, but then you would go<br>11 to Vivid or Hoops as needed?<br>12 A. Correct.<br>13 Q. And Mustafa would tell you when<br>14 you would be needed at Rick's?<br>15 A. Mustafa, yes. He would let me<br>16 know tonight or tomorrow night he would<br>17 want me to report to Hoops or report to<br>18 Vivid. | Affidavit ¶ 36, 37<br>I could not choose which restrooms at Rick's, Hoops or Vivid I wished to work. Rather, Defendants directed me to work at their Gentlemen's Clubs, based on their operational needs. However, throughout my employment Defendants would interchangeably assign me to work across their Gentlemen's Clubs, to "fill-in" for other restroom attendants |

### C.   Plaintiff Samb's Affidavit is a Sham Affidavit which Should Be Disregarded

In his affidavit, Plaintiff Samb repeatedly contradicts his deposition testimony. The table below illustrates the specific examples of where his affidavit contradicts his deposition testimony.

| Deposition Testimony | Affidavit |
|---|---|
| Samb Tr. 28: 17-23<br><br>17. Q. Before August of 2023 did you<br>18. receive any performance evaluations for your<br>19. work<br>20. A. No.<br>21. Q. Did you receive any performance<br>22. evaluations after August 2023<br>23. No | Affidavit ¶ 24<br><br>Additionally, the managers used these visits to provide feedback on my performance, address any questions I had, and reinforce company policies related to safety, hygiene, and customer service |
| Samb Tr. 21: 11-25, 22: 2-6<br><br>11 Q. Yes, regarding your scheduling, if<br>12 you had any issues with that would you go to<br>13 Mostapha at Rick's?<br>14 A. Yes. Okay, if I could not go I<br>15 would tell him so he would send someone else.<br>16 Q. If you were going to arrive late at<br>17 the club later than your scheduled time would<br>18 you also contact Mostapha about that?<br>19 A. No.<br>20 Q. Who would you contact?<br>21 A. No one.<br>22 Q. So you would just come in late<br>23 without contacting anybody?<br>24 A. Because I hardly ever was late, I<br>25 always get there on time. At the beginning,<br>yes, but not there, I was never late there.<br>3 Never had that problem.<br>4 Q. You were never late for your<br>5 scheduled start time at Rick's?<br>6 A. Yes, I never got there late. | Affidavit ¶ 35<br><br>I was expected to notify my managers at Defendants' Gentleman's Clubs whenever I: (i) could not show up for a scheduled shift; (ii) would arrive late; or (iii) needed to leave early. For example, if I was unable to show up for a scheduled shift due to a medical emergency, or any other reason, I would inform one of the managers |
| Samb Tr. 21: 11-25<br><br>11 Q. Yes, regarding your scheduling, if<br>12 you had any issues with that would you go to<br>13 Mostapha at Rick's?<br>14 A. Yes. Okay, if I could not go I<br>15 would tell him so he would send someone else.<br>16 Q. If you were going to arrive late at<br>17 the club later than your scheduled time would<br>18 you also contact Mostapha about that?<br>19 A. No.<br>20 Q. Who would you contact?<br>21 A. No one. | Affidavit ¶ 36<br>It was standard practice to inform my managers about any scheduling changes, or absences, over phone or text. The general managers repeatedly scolded me for showing up late, without informing them |
| Samb Tr. 29: 21-25, 30:2-12<br><br>21 Q. After August 2023 did you have to<br>22 clock in every time you began working at the<br>23 club?<br>24 A. Yes.<br>25 Q. Before August 2023 you did not have<br>2 to punch in before you started working at the<br>3 club?<br>4 A. No.<br>5 Q. After August 2023 do you have to<br>6 punch out every time you stopped working at<br>7 Rick's?<br>8 A. Yes. | Affidavit ¶ 42<br>On or around August 8, 2023 (i.e., four (4) months after this lawsuit was initiated), Mr. Garrido, Mr. Skelly, Mr. DiMaria and Ms. Morelli offered me the opportunity to work at Defendants' Gentlemen's Clubs as an employee. Based on their offer of 'employment,' there were to be no changes in my job responsibilities or duties. Based on their offer of 'employment,' there were to be no changes to my schedule |

| | |
|---|---|
| 9 Q. Before August 2023 did you have to<br>10 punch out every time you stopped working at<br>11 the clubs?<br>12 A. No. | |
| Samb Tr. 11: 3-7; 15: 6-12; 21: 11-15;<br><br>Samb Tr. 10: 15-25, 11:2-10<br><br>3 Q. So from what you know [Mustafa was] the one<br>4 who hired you?<br>5 A. Yes, because he was working there<br>6 and I was looking for work. He told me that<br>7 they needed a worker.<br><br><br>6 Q. So when you met Mostapha he told<br>7 you what was required of you working as a<br>8 bathroom attendant; is that right?<br>9 A. Yes.<br>10 Q. He explained what your duties would<br>11 be?<br>12 A. Yes.<br><br>11 Q. Yes, regarding your scheduling, if<br>12 you had any issues with that would you go to<br>13 Mostapha at Rick's?<br>14 A. Yes. Okay, if I could not go I<br>15 would tell him so he would send someone else. | Affidavit ¶ 49<br><br>Defendants' general managers – not Mustafa – had the exclusive right to discipline me, adjust my schedule, hire or fire me, change my pay, and supervise my performance |

### D. Plaintiff Mbaye's Affidavit is a Sham Affidavit which Should Be Disregarded

In his affidavit, Plaintiff Mbaye contradicts his deposition testimony. The table below illustrates the specific examples of where his affidavit contradicts his deposition testimony.

| Deposition Transcript | Affidavit |
|---|---|
| Mbaye Tr. 92: 2-24<br><br>9 Q. And earlier you testified when<br>10 you first started working there you were<br>11 told by Mustafa that your schedule would be<br>12 Sundays and Mondays, right?<br>13 A. That's his days off. That's<br>14 when they needed somebody.<br>15 Q. Mustafa told you that would be<br>16 your schedule?<br>17 A. Yes.<br>18 Q. That schedule didn't change at<br>19 any point?<br>20 A. Never.<br>21 Q. And the hours on Sundays and<br>22 Mondays, Mustafa also told you you would be<br>23 working those hours?<br>24 A. Yes. | Affidavit ¶ 37<br><br>Mr. Garrido, Mr. Skelly, Mr. DiMaria, Mr. Abreu, and Mr. Kevlin managed my work schedule at Rick's. Regardless of whether there were three (3) patrons, on a slow night, or hundreds of patrons, on a busy night, I was expected to stay for the full shift. Mr. Garrido, Mr. Skelly, Mr. DiMaria, Mr. Abreu, and Mr. Kevlin were responsible for assigning my hours, and adjusting my fixed schedule, depending how busy Rick's was |

### E. Plaintiff Diop's Affidavit is a Sham Affidavit which Should Be Disregarded

In his affidavit, Plaintiff Diop contradicts his deposition testimony. The table below illustrates the specific examples of where his affidavit contradicts his deposition testimony.

| Deposition Transcript | Affidavit |
|---|---|
| Diop Tr. 76: 12-20, 24-25, 77: 2-4 | Affidavit ¶ 50 |
| 12 Q Did [Mustafa] tell you what you<br>13 had to wear to work at Rick's?<br>14 A No, no. That, I know in all of<br>15 New York. Even if I go into a restaurant,<br>16 I see that everybody's dressed in black.<br>17 I don't -- that's all. I don't need<br>18 [Mustafa]to tell me that.<br>19 Q So nobody told you what you had<br>20 to wear, you just knew?<br>24 THE INTERPRETER (FOR THE WITNESS):<br>25 So I already know people who work like<br>2 that in my community. So they tell each<br>3 other the uniform of a bathroom attendant<br>4 is to dress in black. It's universal. | Throughout my employment, I was expected to either wear all black, or a white shirt, with dress pants and a vest – similar to Defendants' security staff |
| Diop Tr. 41: 17-24, 42: 2-9, 43: 8-9, 44: 2-5, 9-12. | Affidavit ¶¶ 53, 55 |
| 17 Q And why did you stop working at<br>18 Vivid?<br>19 A For what reason? So I stopped<br>20 working there because I asked them to pay<br>21 me. So I would ask the manager, and the<br>22 manager would say, "I'm going to talk to<br>23 my superiors," but then there would be no<br>24 response.<br>2 scratch that. Did anybody tell you why<br>3 you would no longer be working at Vivid?<br>4 A If someone told me that? No.<br>5 No one ever told me that.<br>6 Q Then what is the basis for your<br>7 belief that they no longer wanted you to<br>8 work at Vivid because you asked for your<br>9 pay?<br>8 So it's me who thinks that they don't want<br>9 anything more of me.<br>2 Q So just for clarification,<br>3 you're saying you stopped working at Vivid<br>4 because you no longer wanted to be a<br>5 restroom attendant?<br>9 THE INTERPRETER (FOR THE WITNESS):<br>10 So I stopped because what I was asking<br>11 for, they didn't do, and so I stopped.<br>12 But it's not them who told me to stop. | On April 13, 2023, Mr. Castro threatened to terminate me in the middle of my shift at Vivid. On August 1, 2023, Mr. Castro and Mr. Kevlin both threatened to terminate me in the middle of my shift at Vivid. On August 8, 2023, Mr. Castro terminated me in the middle of my shift at Vivid |

## POINT II

## PLAINTIFFS' WERE NOT EMPLOYEES OF THE CLUBS UNDER ANY OF THE TESTS

### A.    Standard of Law

The economic realities test is the test applied by federal courts in the Second Circuit to

determine whether workers are employees. *Saleem v. Corp. Transportation Grp*., Ltd., 854 F.3d

131, 139 fn. 19 (2d Cir. 2017) (noting that the five factor economic reality test is what is used by courts in the Second Circuit to determine whether workers are employees).

Under the economic realities test, courts typically apply a five-part test to determine whether workers are employees of a business: (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business. *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 142 (2d Cir. 2008) (*citing Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058-59 (2d Cir. 1988)).

**B.    Plaintiffs Were Not Employees of Any of the Defendants Under the Economic Realities Test**

**a.    The Clubs Did Not Exercise Control Over Plaintiffs**

Regarding the most important factor in the FLSA economic realities test, there is no genuine dispute of material fact that the Clubs did not exercise control over Plaintiffs' work as restroom attendants. In fact, the evidence in this case shows that the (1) Clubs did not hire or fire any of the Plaintiffs (*See* Defs. 56.1 ¶¶ 18, 42); (2) Clubs did not control Plaintiffs' work schedules (*Id*. ¶¶ 24, 25); (3) Clubs did not evaluate Plaintiffs' work (*Id*. ¶ 41); (4) Clubs did not require Plaintiffs to purchase any "tools of trade" (*Id*. ¶ 31); (5) no employee of the Clubs instructed Plaintiffs regarding how to perform their job (*Id*. ¶ 40); and (6) Plaintiffs could and did permit others to perform restroom attendant services on their behest (*Id*. ¶ 41).

- The Restroom Attendant Agreements were signed by only two of the Plaintiffs, Mbaye and Diop. Moreover, the Agreements make it clear that the Restroom Attendant has "full control on how [his] service will be performed subject to it meeting the standards required

7

by the Club and applicable law." Mizrahi Decl., Exhibit J 1(b). While Plaintiffs cite to the Restroom Attendant Agreements list of services to be provided as an example of "control," simply setting forth the services to be provided by Restroom Attendants is not control. Under the economic realities test the issue is whether the principal exerts control over the means by which services are rendered.  An agreement that certain services will be provided is not an example of such control.  Of course, virtually all contracts for services are going to set forth what services are being contracted and required to be provided under the contract.

- The Clubs did not evaluate Plaintiffs' work nor did any employee of the Clubs instruct Plaintiff on how to perform their work. *See* Defs. 56.1 ¶¶ 40-41.

- Plaintiffs were not provided their schedules by the Clubs, nor did they have to ask any employee of the Clubs if they wanted to take time off. *See* Defs. 56.1 ¶¶ 24, 25. Indeed, it was Mustafa, not any employee of the Clubs that provided Plaintiffs with their schedules. *Id*. ¶ 23. Moreover, although Mustafa provided Plaintiffs with their schedules, Plaintiffs were free to, and did, arrive and depart from the Clubs whenever they wished. *Id*. ¶ 24. At most, certain of the Clubs sought to have bathroom attendants in their club during certain days and hours.  Even then, the record is clear that the Plaintiffs themselves arrived when they wanted and left when they wanted. *Id*. ¶ 23.

- It is simply untrue that Plaintiffs reported to the Clubs' managers, and in fact the undisputed evidence in this case shows that Plaintiffs reported to Mustafa and Mustafa alone. *Id*. ¶¶ 4, 6, 19.

- It was Mustafa who assigned Plaintiffs the locations at which they would be providing their services. In fact, Plaintiff Modou Diop testified it was Mustafa who told him that he needed

to provide Restroom Attendant services at one of the Clubs, Hoops Cabaret. The record is also clear that Mustafa told the Clubs who would be working at the Clubs and when, and not the other way around.  Diop Tr. 66:7-11 ("Q So was it Moustapha who told you that they needed you to work at Hoops? A Yeah. He's the one who would say that. But I didn't work there a lot,  just a little.").

- It is undisputed that the Clubs did not tell Plaintiffs that they were required to wear any type of uniform. Defs. 56.1 ¶ 21.  To the extent that Plaintiffs believed that they were expected to wear any type of clothing, they testified that (1) they were told by Mustafa what to wear or (2) they believed that Restroom Attendants were supposed to wear certain type of clothing based on prior experience, not because the Clubs told them what to wear. *See* Diakite Tr. 55: 12-17; Diop Tr. 76: 12-20, 24-25, 77: 2-19; Samb Tr. 28: 24-25, 29: 2-9; Mbaye Tr. 91: 21-25, 92: 2-8.

- Moreover, Plaintiffs' compensation was based on the services they provided to their customers. Indeed, the amount earned by Plaintiffs was based on the services provided to customer, including offering customers breath mints, cologne, and gum, which Plaintiffs purchased with their own money as investment in their businesses. Defs. 56.1 ¶¶ 28-30.

- It was Mustafa who brought Plaintiffs to the Clubs to perform services – no employee of the Clubs "hired" Plaintiffs. Defs. 56.1 ¶ 6. Nor were Plaintiffs terminated by the Clubs – they stopped working at the Clubs on their own accord or because Mustafa decided not to continue to schedule them. *Id*. ¶ 42.

### b. Plaintiffs Made Significant Investments In Their Businesses and Faced Opportunities For Profit And Risks of Loss

That "Plaintiffs invested heavily" is "another indication that they were in business for themselves." *Saleem*, 854 F.3d at 144. Here, Plaintiffs invested in their businesses by purchasing

products to provide to customers that used the restrooms in the Clubs. Defs. 56.1 ¶¶ 30-34. Indeed, according to Plaintiffs, they spent several hundreds of dollars each month purchasing these products. *Id*. ¶ 34. These investments were critical to Plaintiffs' businesses as they made money based payments from customers. *Id*. ¶ 30. In other words, Plaintiffs' investments (*i.e*. in their bathroom products) and their skill determined their profits or losses.

### c.    Plaintiffs' Success Depended On Their Skill and Initiative

Where success depends on workers' skill in performing their duties and their independent initiative in expanding business opportunities, this factor favors independent contractor status. *See Chao v. Mid-Atlantic Installation Servs., Inc.,* 16 Fed. App'x. 104, 107 (4th Cir. 2001) (affirming independent contractor status where a worker's "net profit or loss depends on his skill in meeting [business requirements], thereby avoiding backcharges" and "on the business acumen with which the worker makes his required capital investments in tools, equipment, and a truck"); *Saleem*, 854 F.3d at 145-46.

In their opposition brief, Plaintiffs ignore entirely that their earnings (*i.e*. their payments from customers) depended on their ability to provide a positive experience to those who used the restrooms. Defs. 56.1 ¶¶ 30-35. Another factor ignored by Plaintiffs is that their success as restroom attendants depended on managing their expenses, specifically the amount of money they spent on items such as cologne, mints, gum, candy and mouthwash – which was entirely in their discretion. *Id*. ¶ 32. Any amount spent on these items would reduce the profits earned by Plaintiffs.

### d.    Plaintiffs Had Full Control Over the Duration And Permanence of Their Relationship with the Clubs

Plaintiffs could provide services at competing clubs or other establishments, at any time, including during the period they were working at the Clubs. Defs. 56.1 ¶ 42. It was completely up to Plaintiffs when and for how long they provided services at the Clubs. In sum, the duration of

Plaintiffs' services at the Clubs was entirely up to Plaintiffs who could cease providing services at the Clubs at any time and provide their services elsewhere. Accordingly, these facts support contractor status. *See Saleem*, 854 F.3d at 147 (affirming summary judgment finding of independent-contractor status and underscoring that whatever "the permanence or duration of Plaintiffs' affiliation with Defendants . . . both its length and the regularity of work was entirely of Plaintiffs' choosing");  *see also Franze v. Bimbo Bakeries USA, Inc*., 826 F. App'x 74, 78 (2d Cir. 2020) ("Although Appellants point to the length of their relationships with Bimbo, like the black-car drivers in Saleem, this was 'entirely of [Appellants'] choosing.")

Plaintiffs entirely ignore that Plaintiffs had full control over the duration and permanence of their work at the Clubs, and instead puzzlingly focus on the *combined* duration of time Plaintiffs worked as Restroom Attendants. However, as noted above, it is Plaintiffs' control over their duration and permanence that is relevant to this factor and Plaintiffs undeniably had full control over how long they worked as restroom attendants.

### e.    Restroom Attendants Are Not Integral to the Club's Business

The Clubs are in the adult nightclub business and restroom attendants are not at all integral to the Clubs' business. Defs. 56.1 ¶ 2. Customers patronize the Clubs to socialize, sit at the bar and enjoy the entertainment provided by the Clubs' dancers together with the drinks dispensed by the Clubs' bartenders. *Id*. Clearly, patrons do not come to the Clubs to spend time in restrooms. Clearly, the Clubs would still have a viable business without restroom attendants. *See Franze*, 2019 WL 2866168, at *11 ("Plaintiffs' role in delivering baked goods in the distribution chain to retail consumers was a small, albeit, important, piece of this model, without which Bimbo would still have a viable business. Therefore, the Court finds that this factor weighs in Defendants' favor."). Irrefutable evidence that restroom attendants are not integral to the Clubs' business is the

undisputed fact that restroom attendants are not even present at the Clubs every day or night the Clubs are open. Defs. 56.1 ¶¶ 8, 9.

Plaintiffs argue that restroom attendants are integral to the Clubs' business because they claim that they monitor the restrooms and their presence may discourage drug use or other illegal activity. However, it is undisputed that the Clubs employ security personnel that are present at all times that the Clubs are open for the purpose of security. Defs. 56.1 ¶ 38. As stated above, if restroom attendants were essential for this purpose they would be present in the clubs at all times. But it is undisputed that they are not.

###    C.    Plaintiffs Were Not Employees of Defendants Under the Formal Control Test

Implicitly admitting that they cannot be successful under the economic realities test, Plaintiffs ask this Court to apply the  "formal control" test to determine whether the Clubs are joint employees of the Clubs.  Under the "formal control" test, a court considers whether a defendant: "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."

Defendants have already established that the first three of these factors favor a finding that Defendants did not employ Plaintiffs: (1) the Clubs did not hire or fire Plaintiffs; (2) did not supervise or control Plaintiffs' work or scheduling; and (3) did not determine Plaintiffs' compensation. As to the fourth and final factor under this test, Plaintiffs tellingly fail to acknowledge the fact that Defendants did not maintain employment records for the Plaintiffs. They did not track Plaintiffs hours or days of work. They did not maintain earnings records.  There were no performance evaluations and there were no employment applications. Plaintiffs were not issued W-2s by Defendants. There were no personnel records maintained for the Plaintiffs.

### D.    Plaintiffs Were Not Employees of Defendants Under the Functional Control Test

Under the functional control test, courts consider:

"(1) whether the [alleged employers'] premises and equipment were used for the plaintiffs' work; (2) whether the [purported subcontractor] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to the [alleged employers'] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [alleged employers or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the putative joint employer]."

*Zheng v. Liberty Apparel Co*., 355 F.3d 61, 72 (2d Cir.2003). A court "need not decide that every factor weighs against joint employment" in order to grant summary judgment for the putative joint employer. *Id*. at 77.  As discussed above, the evidence is indisputable that Plaintiffs' work as restroom attendants was not integral to the Clubs' business. Additionally, it was Mustafa, not any employees of the Clubs who supervised and controlled Plaintiffs' work. Moreover, Plaintiffs could provide services at competing clubs or other establishments, at any time, including during the period they were working at the Clubs. Defs. 56.1 ¶ 42.

## POINT III

## RCI HOSPITALITY HOLDINGS INC. SHOULD BE DISMISSED AS A DEFENDANT

Defendant RCI Hospitality Holdings, Inc. ("RCIHH") should be dismissed from this litigation because it does not operate any of the three clubs at which Plaintiffs' provided services and therefore cannot be considered Plaintiffs' employer. Defs. 56.1 ¶ 1. In their opposition brief, Plaintiffs cite to the deposition testimony of the Clubs' managers which supposedly supports their argument that RCIHH operated the Clubs, but as explained in Defendants' Rule 56.1 rebuttal, Plaintiffs completely misrepresent manager's testimony, none of which supports the claim that RCIHH operated the Clubs.  In fact, there is no testimony from any one of the Clubs' managers

that RCIHH had any input whatsoever related to the relationships between the Clubs and restroom attendants, including whether to designate workers as 1099 or W-2 employees.

## POINT IV

## THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED FROM THE ACTION

Individual Defendants Kes Senevi and Eric Langan should be dismissed from this litigation because Plaintiffs have failed to produce any evidence that either Senevi or Langan were involved whatsoever in the Clubs' relationship with restroom attendants.[2] *See Ocampo v. 455 Hosp. LLC*, No. 14-CV-9614 (KMK), 2021 WL 4267388, *7-8 (S.D.N.Y. Sept. 20, 2021), aff'd sub nom. *Ocampo v. Brown & Appel, LLC*, No. 21-2579-CV, 2022 WL 17684587 (2d Cir. Dec. 15, 2022) (dismissing individual defendant where the evidence failed to show that he affected plaintiffs' conditions of employment). In fact, no Plaintiff even claims that they ever communicated or interacted with either Senevi or Langan when they were working as restroom attendants. *Id*. at *7 ("Plaintiffs further admit that no Plaintiff ever communicated with [individual defendant] or interacted with him concerning their hiring, firing, compensation, or terms of employment."). And there is no deposition testimony or documentary evidence in this case that either individual had any involvement in the hiring, firing or compensation decisions regarding Plaintiffs.

## POINT V

## PLAINTIFFS FAIL IN THEIR ATTACK OF DEFENDANTS' WITNESSES TESTIMONY

Plaintiffs argue that (1) the Court should not assign any weight to the deposition testimony of Charlie Castro and Thomas Campbell; and (2) the Court should not credit the Declaration of

---

[2] The Court has the discretion to consider new arguments raised in a reply brief, and where the argument relates to an element of a claim that is a plaintiff's burden to establish, there is no prejudice to the plaintiff in considering those arguments. *Malone v. Town of Clarkstown*, No. 19 CV 5503 (VB), 2022 WL 2834105, fn. 7 (S.D.N.Y. July 20, 2022). Here, Plaintiffs have the burden of proving that Defendants Senevi and Langan are employers under the FLSA and NYLL. *See Ocampo* 2021 WL 4267388, at *7.

Shaun Kevlin because they allege it is a sham affidavit. Both of these arguments entirely lack merit.

First, Plaintiffs argue that Charlie Castro and Thomas Campbell deposition testimony should be disregarded because Mr. Castro and Mr. Campbell "lack credibility" due to supposedly not reviewing their affidavits submitted in a separate case, before signing those affidavits. However, courts "cannot engage in credibility determinations on a motion for summary judgment." *Kaplan v. Home Depot USA, Inc*., No. 11 CIV. 2125 PAE, 2012 WL 3283456, at *4 (S.D.N.Y. Aug. 13, 2012). The law is clear on this and it is not a credibility determination by the Court of the kind that the Plaintiffs can ask this Court to engage in.

Second, Plaintiffs argue that the Court should treat the Declaration of Shaun Kevlin as a sham affidavit because Mr. Kevlin responded "I don't know" to various questions asked by Plaintiffs' counsel during his deposition. However, this is also not a basis to disregard Mr. Kevlin's declaration. The sham affidavit doctrine does not apply where the subsequent sworn statement does not actually contradict the affiant's testimony. *See Fed. Deposit Ins. Corp*. 500 F. Supp. 3d at *94-95. Plaintiffs do not and cannot actually point to any assertion in Mr. Kevlin's declaration which contradicts his deposition testimony.

## <u>CONCLUSION</u>

For the reasons set forth above and Defendants' opening brief, pursuant to Fed. R. Civ. P. 56, Defendants respectfully request that the Court issue an Order granting Defendants' motion for summary judgment dismissing this action with prejudice, or alternatively, dismissing RCI Hospitality Holdings, Inc and the individual defendants as defendants in this case, along with such other and further relief as the Court may deem just and proper.

Dated: New York, New York
     March 10, 2025

                    Respectfully submitted,

                    AKERMAN LLP

                    /s/ Jeffrey A. Kimmel
                    Jeffrey A. Kimmel
                    M. Adil Yaqoob
                    1251 Avenue of the Americas, 37th Floor
                    New York, New York 10020
                    Tel: (212) 259-6435
                    Fax: (212) 905-6408
                    Email: jeffrey.kimmel@akerman.com
                            adil.yaqoob@akerman.com

                    *Attorneys for Defendants*

## **CERTIFICATE OF WORD COUNT COMPLIANCE**

The undersigned hereby certifies that the *DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56* complies with Local Civil Rule 7.1(c) and that, it totals fewer than 5,543 words, exclusive of the caption, signature lines, and certificate of service.

Dated: New York, New York
March 10, 2025

By: */s/ Jeffrey A. Kimmel*
Jeffrey A. Kimmel Esq.

*Attorney for Defendants*